THE PULLMAN COMPANY *v.* ANDERSON, ADMINISTRATOR.

4-7103 172 S. W. 2d 431

Opinion delivered June 21, 1943.

*Lowell M. Greenlaw* and *Moore, Burrow, Chowning & Hall,* for appellant.

*F. D. Goza* and *McMillan & McMillan,* for appellee.

SMITH, J. Appellee, as administrator of the estate of Pryor Townsend, recovered judgment for $1,000 against appellant, The Pullman Company, for the breach of an alleged contract to transport the deceased Townsend as a passenger in one of its sleeping cars from Pharr, Texas, to Arkadelphia, Arkansas.

There are conflicts in the testimony which cannot be reconciled, but the plaintiff's case rests upon the testimony of his wife, who was the sister of the deceased, and is to the following effect. She lived near Arkadelphia, Arkansas. Her brother, the deceased, lived in Pharr, Texas. Sometime in January, 1942, deceased suffered a stroke and was at the same time suffering from a rupture. She went to Texas for the purpose of bringing her brother to her home and, on Wednesday, January 21, applied to the railroad station agent at Pharr, Texas, for transportation. She explained very particularly that she wished one first-class passenger ticket for her brother, which she was required to buy to get a sleeping car ticket for him, but that she wanted only a day coach ticket for herself. The station agent told her he had prepared tickets as requested, and these were given her, and she paid the fares demanded, which she testified totaled between $42 and $43.

She and her brother boarded the train at Pharr. He was furnished a lower berth in the sleeping car from Pharr to San Antonio, and she rode in the day coach, but was allowed to visit her brother in the sleeper. The train left Pharr about 8:00 p. m. and arrived in San Antonio the following morning. When they arrived at San Antonio, her brother was placed in a wheel chair and taken by a red cap into the station for breakfast. After eating, her brother was returned in the chair to the train. A different conductor was in charge of the sleeper. She presented the tickets purchased at Pharr and was refused admission to the sleeper because she

had no sleeping car ticket from San Antonio to her destination. She returned to the station and interviewed the ticket agent who referred her back to the sleeping car conductor. She declined to pay the conductor the additional fare which he demanded, that is the sleeping car fare from San Antonio to Arkadelphia. There is a conflict in the testimony as to whether she had the amount of money necessary for that purpose, but there is no conflict as to her having the opportunity to pay the additional fare, and it was admitted that a lower berth would have been furnished had this additional fare been paid.

Her brother stood the trip well from Pharr to San Antonio. When denied sleeping car transportation from San Antonio to her destination, she went with her brother into the day coach where he soon became ill and his condition grew progressively worse and his suffering was very great until he finally became unconscious, and he had to be carried from the train when he arrived at Arkadelphia, and he died the following day. No complaint is made that the verdict is excessive, if there is liability, as the sick man was compelled to ride a distance of some six or seven hundred miles in an upright position, and his rupture rapidly enlarged during this time.

Mrs. Henderson testified that the tickets which she purchased at Pharr were placed in an envelope which she put in her purse, and that they were not removed therefrom except to exhibit them to the conductors. She had been told that she had lower berth number 2 in car 1 from Pharr to San Antonio, and lower berth number 4 in another car from San Antonio to Arkadelphia, but an examination of her sleeping car ticket, which was offered in evidence, would have disclosed that she had no ticket for such transportation beyond San Antonio.

The traffic rates, or schedule of the fares, here in question as approved by the Interstate Commerce Commission, were offered in evidence, and are as follows:

First Class Railroad Ticket from Pharr to Arkadelphia, $22.47, a Coach Ticket from Pharr to Arkadelphia, $14.99, a Lower Berth from Pharr to San Antonio, $2.65, Federal Transportation Tax $2. These items

total $42.11, and Mrs. Anderson testified that she paid for her tickets between $42 and $43. The fact is, therefore, undisputed that Mrs. Anderson did not pay Pullman fare from San Antonio to Arkadelphia, and the fact is also undisputed that she did not receive a Pullman ticket for her brother from San Antonio to Arkadelphia.

For the affirmance of the judgment here appealed from appellee says that this case is governed by the rules of law laid down in *Hot Springs R. Co.* v. *Deloney,* 65 Ark. 177, 45 S. W. 351, 67 Am. St. Rep. 913, and *Pullman Co.* v. *Walton,* 152 Ark. 633, 239 S. W. 385, 23 A. L. R. 1298.

The facts in the first of these cases were that the plaintiff purchased tickets for himself and his brother for passage for both from Hot Springs to Atkins, Arkansas, and that, as the opinion states, "paid the full and regular fare therefor," but through an error in making up the tickets they were ejected from the train before completing their trip, in fact were refused transportation soon after they began their trip. The railroad company was held liable for the error of the ticket agent in not delivering the proper tickets for which the passengers paid the full and correct fare.

In the Walton case, *supra,* the facts were that a passenger accompanied his brother, who was in ill health, from a point in Colorado to their home in Clarksville, Arkansas. Sleeping car accommodations were obtained from Pueblo, Colorado, to Kansas City, and reservations were secured at Pueblo by wire from Kansas City for sleeping car accommodations to Clarksville. When they reached Kansas City, they applied for the reservation previously obtained. The reservation called for lower berths 7 and 8 in car number 9, but they were told car number 9 would not go out but that car number 8 would go and they were sold lower berths number 4 and 5 in car number 8. They were refused admission to car number 8 on the ground that the berths for which their tickets called had already been sold and were occupied. The conductor declined to furnish even an upper berth for the invalid for the reason that all the berths had been

sold and were occupied. Being unable to get berths, Walton and his brother rode in the day coach from Kansas City to Clarksville to the great discomfort and injury of the invalid passenger.

It was there said that there was no question about the right of the sleeping car company to require the purchase and exhibition of tickets and to promulgate and enforce rules with respect to the operation of its cars, but that this right and its exercise would not absolve the company from liability for the negligence of its servants in refusing to furnish accommodations in accordance with tickets purchased by patrons.

It will be observed that there is a distinction, and one which we think is controlling, between the two cases just referred to and the instant case, and that is that in those cases it was assumed that the passengers had purchased tickets entitling them to transportation which was not furnished, while here the passenger did not purchase or pay for the transportation which was demanded, nor did she offer to do so although that opportunity was afforded at San Antonio.

The jury, no doubt, found, and the testimony supports the finding, that Mrs. Anderson desired to purchase sleeping car accommodation for her brother to Arkadelphia, that she applied for such accommodation and was told she had purchased it, but the undisputed testimony is that she was given tickets which cost the sum she paid, and that she did not pay the sum required for sleeping car accommodations to Arkadelphia.

There are an almost infinite number of cases on the subject and it would be a work of supererogation to review them. Many of these cases, including a number of annotated cases, are cited in the note to § 1080 of the chapter on Carriers, 10 C. J., p. 662, which text reads as follows: "Under the Interstate Commerce Act a carrier must publish passenger rates, and cannot charge a less or a different rate than that specified in its published rates, unless such rate is found to be unreasonable by the Interstate Commerce Commission; and neither the misquotation of rates nor ignorance is an excuse for

charging or paying less or more than the filed rates, since passengers, as well as the agents of the carrier, are presumed to know such rates. The publishing and filing of such rates may also be required by the order of a public service commission. Although a passenger might have gone and returned by a direct route to and from his point of destination, if he expresses a desire to go and come by a different route he must pay the filed tariff rates for the route taken notwithstanding a misquotation made by the carrier's agent and accepted by him in good faith, since such a mistake is not a mere misrouting by error of the carrier which will relieve the passenger from paying the tariff rate for the route he has taken.''

A case, which many others have cited, and which is binding on all state courts as it relates to interstate commerce is that of *Louisville & Nashville R. R.* v. *Maxwell*, 237 U. S. 94, 35 S. Ct., 494, 59 L. Ed. 853, L. R. A. 1915E, 665. Justice HUGHES there said: ''Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination. The Act provides: . . .'' And he then quotes the inhibition of the Act against charging more or less or a different rate of fare than that fixed by the Interstate Commerce Act.

In the case of *Foley* v. *Chicago Great Western R. Co.,* 205 Ia. 72, 217 N. W. 563, the facts were that the railroad company made an excursion rate for passengers, which was filed with and approved by the Interstate Commerce Commission. Under the rate thus approved, tickets sold at this excursion rate were good only on a certain train, but the agent who sold the tickets told the

passenger they would be accepted on another train. The passenger applied for transportation on this other train, but was ejected therefrom. He sued for damages and testified that he was not informed of the restricted use of his ticket, and that the ticket showed no limitation to any particular train, and that he was told by the agent who sold him the ticket that it would be accepted for passage on the train from which he was ejected.

In reversing the judgment, which the plaintiff recovered in the trial court, the Supreme Court of Iowa said:

"The provisions of the Interstate Commerce Act (U. S. Comp. St. 1916, § 8569 *et seq.;* 1923 Supplement, § 8569 *et seq.,* and Annotations (49 U.S.C.A., § 6 *et seq.*)) on the subject of rates are designedly stringent and unyielding, and thereby all sorts of discriminations and special favors are prohibited under penalty for violation. Subterfuges for evasion are not only forbidden, but the policy of the law is to prevent them by making them impossible. Permission to one customer to make use of a train other than those approved or allowed by the schedule would be to confer on him a special favor in manifest violation of the terms and spirit of the act. The trial court conceded that in an action *ex contractu* the ticket would be void for train No. 12, but, holding that this action was *ex delicto,* thought defendant was liable for tort. Plaintiff's petition seems to sound in contract rather than in tort. Conceding, however, that the action is *ex delicto,* it is manifest that to permit the carrier to suffer judgment for tort, such as for misrepresentations of the contents of the schedule, would widely open the door for granting special favors and for evasion. The carrier would only have to concede that it had committed a wrong, make concession in settlement on account thereof, and thereby circumvent the law.

"But apart from this the rate fixed by the schedule is not simply a matter of contract, nor is the filing of the schedule merely a matter of notice. The schedule has the force of law. Both carrier and customer are bound to know the rate and its accompanying limitations and

privileges. It makes no difference that the customer did not in fact see or know of the published schedule, nor is it material that the carrier knows of the agent's or the customer's ignorance. (Citing numerous cases). Manifestly there can be no actionable misrepresentation of that, the truth whereof both parties are conclusively held to know, nor may the carrier be held as for a tort for ejecting a passenger whose ticket both parties are bound to know is invalid and who refuses to pay his fare. *Central of Georgia Railway Co.* v. *Britt,* 21 Ga. App. 314, 94 S. E. 283; *Trezona* v. *Chicago Great Western Ry. Co.,* 107 Iowa 22, 77 N. W. 486, 43 A. L. R. 136; 10 C. J. 739."

Inasmuch as the passenger in this case had no sleeping car ticket from San Antonio to Arkadelphia, and had not paid for such a ticket, the judgment must be reversed and as the case has been fully developed it will be dismissed.